**KELLOGG COMPANY,**
**Plaintiff/Counter**
**Defendant,**

v.

**EXXON MOBIL CORPORATION,**
**Defendant.**

No. 96–3070 G/A.

United States District Court,
W.D. Tennessee,
Western Division.

June 7, 2001.

William M. O'Callaghan, Furth Fahrner & Mason, San Francisco, CA, Charles F. Morrow, Butler Snow O'Mara Stevens & Cannada, PLLC, Germantown, TN, Grady M. Garrison, Bulter Snow O'Mara Stevens & Cannada, PLLC, Memphis, TN, Bruce J. Wecker, San Francisco, CA, Daniel S. Mason, Christopher T. Micheletti, Zelle Hofmann Voelbel & Gette, San Francisco, CA, for Kellogg Co.

Buckner Wellford, John J. Thomason, Thomason Hendrix Harvey Johnson & Mitchell, Memphis, TN, Robert D. Rippe, Jr., William R. Cohrs, Charles A. Beach, Exxon Corp., Irving, TX, Louis T. Pirkey, William G. Barber, Stephen P. Meleen, Fulbright & Jaworski, Austin, TX, for Exxon Mobil Corp.

ORDER PARTIALLY GRANTING AND PARTIALLY DENYING EXXON MOBIL'S MOTIONS FOR SUMMARY JUDGMENT WITH RESPECT TO TRADEMARK DILUTION

GIBBONS, District Judge.

On October 6, 1996, plaintiff Kellogg Company ("Kellogg") brought this action for trademark infringement, trademark di-

lution, and unfair competition against defendant Exxon Mobil Corporation ("ExxonMobil" or "Exxon"),[1] seeking to protect the name and image of its spokesman "Tony the Tiger" from injury due to Exxon's use of its own cartoon tiger icon ("Cartoon Tiger").[2] Exxon responded and filed a counterclaim on November 15, 1996, seeking a declaration of its trademark rights pursuant to 15 U.S.C. § 1119 for use of the "Hungry Tiger" and "Tiger Express" marks for the promotion of the retail convenience stores that Exxon operates at its gasoline stations. Now, after a long procedural history,[3] the court considers Exxon's motions for summary judgment on Kellogg's dilution claims.

The record reveals the following undisputed facts. In 1952, Kellogg introduced the presweetened corn flake product now called "Kellogg's Frosted Flakes." (Compl. ¶ 7.) In order to market its new cereal, Kellogg created a fictitious cartoon character called "Tony the Tiger," whose name and likeness it registered with the United States Patent and Trademark Office ("USPTO"). (Compl.Ex.B.) In 1964, Exxon began using its own Cartoon Tiger as part of its national "Put a Tiger in Your Tank" advertisement campaign. (Bennett Decl. at 1–2 & Ex. F.) Exxon subsequently registered this tiger mark with the USPTO in 1965. (Answer Ex. A.) Kellogg was aware of Exxon's use of the Cartoon Tiger in connection with the "Put a Tiger in Your Tank" media campaign (Kellogg's Resp. to First Req. for Admis. No. 38) and did not oppose Exxon's federal registration of the mark (Kellogg's Resp. to First Req. for Admis. No. 61).

In the early 1980's, McCann–Erickson, Exxon's advertising agency, recommended that Exxon phase out the use of its Cartoon Tiger in marketing and instead use a live tiger that it felt was more befitting the time period:

> The animated, happy-go-lucky tiger … used in the (seemingly) carefree 1950's is not conducive to the serious topic of energy in the 1980's. The live tiger with all of its raw natural power and grace, however, is appropriate.

(Collins Dep.Ex. 255.) Therefore, because of "the somber nature of the times in terms of the need to conserve gasoline," (Atkins Dep. at 70), Exxon instructed its regional managers in an August 12, 1982 letter that "the use of the 'cartoon tiger' is to be discontinued." (Mantell Dep.Ex. 36, at EMK0028027–28.) In November 1985, Exxon nevertheless renewed its federal trademark registration of the Cartoon Ti-

---

1. The complaint actually listed Exxon Corporation as the party defendant, but Exxon gave notice to the court on June 23, 2000, that it had changed its name to Exxon Mobil Corporation. In its memoranda, however, Exxon Mobil refers to itself as both "Exxon" and "ExxonMobil."

2. At various times in its filings with the court, Exxon has referred to its cartoon tiger as "Whimsical Tiger," "Hungry Tiger," and "Cartoon Tiger." All of these appellations refer to different stylistic renditions of the same cartoon character. The court will refer to Exxon's cartoon tiger as "Cartoon Tiger."

3. On August 31, 1998, this court granted other summary judgment motions filed by Exxon and dismissed (1) Kellogg's claim of infringe-

ment based on Exxon's affirmative defense of acquiescence; (2) Kellogg's claims of abandonment and progressive encroachment based on a finding that Exxon had not abandoned use of the Cartoon Tiger as a matter of law; and (3) Kellogg's claims of bad faith infringement and dilution as moot. On April 6, 2000, however, the Court of Appeals for the Sixth Circuit reversed this court's decision granting summary judgment to Exxon on Kellogg's claims of infringement, dilution, and abandonment and vacated this court's grant of summary judgment to Exxon on Kellogg's claimed grounds of progressive encroachment. *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 577 (6th Cir.2000). The court now considers Exxon's motions with regard to Kellogg's claims of dilution, as they are no longer moot and are ripe for adjudication.

ger image for marketing motor fuels for an additional twenty years. (Rippe Decl.Ex. D.)

In March 1989, the *Exxon Valdez*, an oil tanker owned by an Exxon subsidiary, ran aground in Prince William Sound, Alaska, and spilled more than 11 million gallons of oil, causing massive destruction to the flora and fauna in the area. In response to negative public reaction to the *Exxon Valdez* spill, Exxon decided to pursue a "softer," "warmer", and "friendlier" advertising campaign. (Stanislaus Dep. at 165; Hale Dep. at 32.) Exxon reintroduced widespread use of the Cartoon Tiger, (Carter Dep.Exs. 41, 42; *Take Pride in CORS!* Pride (Exxon Co., U.S.A.), at 1), but portrayed the Cartoon Tiger differently than it had been before. As its artist elaborated, "Today's Tiger is now cast in a more humanitarian role. He is polite to the elderly, plants trees for ecology and has an overall concern for the environment." (Jones Dep.Ex. 348.)

Exxon also incorporated the Cartoon Tiger into different settings. Exxon had opened its first company-operated gasoline station convenience store in April 1984 (Bulls Dep.Ex. 72) and expanded to approximately 740 stores by 1992 (Herdman Dep.Ex. 31). In 1991, Exxon decided to test the name "Tiger Mart" for its convenience stores and to feature the Cartoon Tiger on the permanent exterior signage at such stores. (Carter Dep. at 46–49.) It therefore changed six of its stores, formerly named "Exxon Shops," to Tiger Marts in 1991 and 1992. (Hudson Decl. ¶ 3.) The number of Tiger Marts increased rapidly; by October 1993, there were about 68 Tiger Marts, and by October 1996, there were over 265 Tiger Marts. (Radous Decl. ¶ 5.) Exxon also opened two larger "Tiger Express" stores by April 1996. *Id.* ¶ 6. The Tiger Express stores and most Tiger Marts depict the Cartoon Tiger on their permanent signage (Hudson Decl. at 81–82; Bruse Dep. at 63), as well as on point-of-sale materials, like displays, fountain beverage cups, insulated mugs, and billboards. (Kellogg's Second Supp.Mem. Opp.Summ.J.Mot. Dismissing Dilution Claims Ex. 4.)

On October 7, 1996, Kellogg filed this action against Exxon for its use of the Cartoon Tiger, categorizing its claims in eight counts: three counts under federal trademark law, *i.e.*, the Lanham Act, 15 U.S.C. § 1051 *et seq.* (trademark infringement, false designation of origin, and trademark dilution); two counts under Tennessee common law (common law trademark infringement and palming off); two counts under Tennessee statutory law (unfair competition under the Tennessee Consumer Protection Act, TennCode Ann. § 47–18–101 *et seq.*, and trademark infringement and dilution under Tenn.Code Ann. § 47–25–501 *et seq.*); and one claim of declaratory relief for trademark abandonment under 28 U.S.C. §§ 2201, 2202. Kellogg seeks preliminary and permanent injunctive relief to prohibit Exxon from continued use of the Cartoon Tiger to market and promote convenience food products, requests that the court order the delivery and destruction of all Exxon items bearing the Cartoon Tiger image in such use, and asks that Exxon be required to abandon with prejudice its application for federal trademark registration of "Hungry Tiger & Design." Kellogg also seeks an equitable accounting of Exxon's profits from using the Cartoon Tiger to advertise food and beverage products, attorneys' fees, and costs.[4] (Am.Compl. at 14–15.)

---

4. Kellogg initially sought compensatory and punitive damages in addition to the other forms of relief. (Compl. at 19.) Kellogg later renounced its intention to seek damages in response to Exxon's motion objecting to those forms of relief. (Kellogg's Resp. Exxon's Mot. Summ.J. Damages at 1.) Exxon has argued

The instant overlapping motions both deal with Kellogg's claims of trademark dilution: one is a motion for partial summary judgment with regard to Kellogg's federal dilution claim under the Federal Trademark Dilution Act ("FTDA"), and the other is a motion for summary judgment regarding Kellogg's dilution by tarnishment claims under both federal and state law. While the Court previously found these motions to be moot, the Sixth Circuit's remand to this court renders them ripe for adjudication.

Summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment "bears the burden of clearly and convincingly establishing the nonexistence of any genuine issue of material fact, and the evidence as well as all inferences drawn therefrom must be read in a light most favorable to the party opposing the motion." *Kochins v. Linden–Alimak, Inc.*, 799 F.2d 1128, 1133 (6th Cir.1986). The moving party can meet this burden, however, by pointing out to the court that the respondents, having had sufficient opportunity for discovery, have no evidence to support an essential element of their case. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989).

When confronted with a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. A genuine issue for trial exists if the evidence is such that a reasonable trier of fact could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party opposing the motion must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmoving party may not oppose a properly supported summary judgment motion by mere reliance on the pleadings. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Instead, the nonmoving party must present "concrete evidence supporting its claims." *Cloverdale Equip. Co. v. Simon Aerials, Inc.*, 869 F.2d 934, 937 (6th Cir.1989). The district court does not have the duty to search the record for such evidence. *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 110–11 (6th Cir.1989); *Street*, 886 F.2d at 1479–80. Respondents have the duty to point out specific evidence in the record that would be sufficient to justify a decision in their favor by the trier of fact. *InterRoyal Corp.*, 889 F.2d at 111.

The concept of trademark dilution derives from the landmark law review article, "The Rational Basis of Trademark Protection," written by Frank Schechter in 1927. *Ringling Bros.–Barnum & Bailey Combined Shows, Inc. v. Utah Div. of Travel Dev.*, 170 F.3d 449, 453 (4th Cir.1999) ("The concept of trademark 'dilution' as distinct from 'infringement' is commonly traced . . . to Frank I. Schechter."); *Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026, 1028 (2d Cir. 1989) (referring to Schechter as "the father of the dilution theory"). Schechter

that Kellogg also relinquished its claim for an equitable accounting of profits at that time. (Kellogg's Mem.Supp.Mot. for Rule 16 Pretrial Management Conference.) In the March 23, 2001 pretrial conference, however, the court determined that it would bifurcate the proof necessary to support an accounting, pending further rulings on Kellogg's entitlement to pursue this form of equitable relief.

was concerned that the law as it stood then only protected trademarks on non-competing goods if another mark created a "likelihood of confusion as to the source of the infringing goods." Frank I. Schechter, *The Rational Basis of Trademark Protection*, 40 Harv.L.Rev. 813, 821 (1927). He argued that the "real injury" caused by similar trademarks on non-competing goods was not confusion about the source of a product, but "the gradual whittling away or dispersion of the identity and hold upon the public mind of the mark or name by its use upon non-competing goods." *Id.* at 825. Concluding that the "selling power [of a trademark] depends ... upon its own uniqueness and singularity," and thus "the preservation of the uniqueness of a trademark should constitute the only rational basis for its protection," Schechter advocated adopting law that would prevent "dilution" of a trademark's uniqueness and hence its selling power. *Id.* at 831–32.

In 1947, Massachusetts enacted the first antidilution statute. *See Ringling Bros.*, 170 F.3d at 454. Since then, the federal government and about half of the states have passed antidilution statutes. *Id.; see* Restatement (Third) of Unfair Competition § 25 Statutory Note (listing states that have passed antidilution laws). While statutory language may differ, there is general agreement as to what constitutes "dilution":

> Dilution occurs when the senior user possesses a distinctive mark, the junior use of which might not, in the short run, result in loss of sales or loss of control over reputation, but might cause a gradual diminution in the mark's distinctiveness, effectiveness and, hence, value. This kind of infringement corrodes the senior user's interest in the trademark by blurring its product identification or by damaging positive associations that have attached to it.

*Ameritech, Inc. v. American Info. Techs. Corp.*, 811 F.2d 960, 965 (6th Cir.1987). As the *Ameritech* Court intimated, two types of dilution are generally recognized: dilution "by blurring", in which the unique and distinctive significance of a mark is weakened; and dilution "by tarnishment", in which the goodwill or reputation associated with the mark is tarnished by association with a context that is totally dissonant with the image projected by the mark. *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1081 (5th Cir.1997). Typically, antidilution statutes only proscribe "dilution" (or "likelihood of dilution") in general and do not distinguish between these two types of dilution in their statutory language, but they nonetheless encompass both within their reach. For example, the FTDA defines dilution simply as:

> the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of—
>
> (1) competition between the owner of the famous mark and other parties, or
>
> (2) likelihood of confusion, mistake, or deception.

15 U.S.C. § 1127 (2000). Even so, Congress contemplated that the FTDA would "protect famous trademarks from subsequent uses that blur the distinctiveness of the mark or tarnish or disparage it," H.R.Rep. No. 104–374, at 3 (1995), *reprinted in* 1996 U.S.C.C.A.N. 1029, 1030, and courts have applied it to cases involving both dilution by blurring and dilution by tarnishment. *See, e.g., Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 832 (8th Cir. 1999) (considering whether Stouffer's "Lean Cuisine" trademark was blurred by Luigino's "Michelina's Lean 'N Tasty" trademark); *Playboy Enters., Inc. v. Netscape Communications Corp.*, 55 F.Supp.2d 1070, 1089 (C.D.Cal.1999) (considering whether Netscape and Excite tar-

nished the Playboy trademark by allowing more risque adult entertainment sites to use the terms "playboy" and "playmate").

In this case, Kellogg asserts claims of both dilution by blurring and dilution by tarnishment. Exxon's first motion presents three grounds for summary judgment: (1) any action taken under the FTDA against Exxon for use of the Cartoon Tiger would be an unconstitutional, retroactive application of that statute, since Exxon began using the Cartoon Tiger before 1996; (2) Kellogg has not shown that Exxon's challenged use of the Cartoon Tiger "causes dilution" of Kellogg's Tony the Tiger mark; and (3) any dilution caused by the specific use of the Cartoon Tiger that Kellogg challenges will be no greater than that caused by other, valid uses of the Cartoon Tiger. The second motion is only directed at Kellogg's claims of dilution by tarnishment and simply contends that Kellogg has not provided enough evidence to support those claims. The court will address the arguments raised by these motions first in the context of Kellogg's federal claims under the FTDA, and then will discuss the state claims.

 Enacted on January 16, 1996, the FTDA amended the Lanham Act to allow plaintiffs a federal right of action for trademark dilution. It provides:

> The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection.

15 U.S.C. § 1125(c)(1) (2000). In Count Three of its complaint, Kellogg alleged that "Exxon's use of the Exxon Cartoon Tiger constitutes a willful attempt to cause dilution of the distinctive quality of Kellogg's famous TONY & TIGER DESIGN® mark," in violation of the FTDA, 15 U.S.C. § 1125(c). (Compl. ¶ 48.) Exxon, however, points out that it developed and utilized the Cartoon Tiger mark long before the FTDA was enacted in 1996. Granting Kellogg relief under the FTDA, according to Exxon, would therefore be an unconstitutional, retroactive application of that statute.

To resolve this issue, the court looks first to the United States Supreme Court's decision in *Landgraf v. USI Film Products*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), as the leading case on retroactive enforcement of federal statutes. In *Landgraf*, the Court determined that provisions of the Civil Rights Act of 1991, which created a right to recover compensatory and punitive damages for certain violations of Title VII and provided for trial by jury if such damages were claimed, did not apply to a Title VII case that was pending on appeal when the statute was enacted in 1991. *Id.* at 286, 114 S.Ct. 1483. In reaching this conclusion, the Court reconciled two lines of precedents: one teaching that "a court is to apply the law in effect at the time it renders its decision," *Bradley v. School Bd. of Richmond*, 416 U.S. 696, 711, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), and another holding, seemingly in contrast, that "congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result," *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). *Landgraf*, 511 U.S. at 263–65, 114 S.Ct. 1483. The Court promulgated an approach for courts to take in considering the possible retroactive application of any congressional statute:

> When a case implicates a federal statute enacted after the events in suit, the

court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, *i.e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

*Landgraf,* 511 U.S. at 280, 114 S.Ct. 1483.

Congress did not expressly address the issue of retroactivity in drafting the FTDA. Consequently, this court must decide whether the relief that Kellogg now seeks constitutes a retroactive application of the FTDA. In making this determination, the court must consider Kellogg's claims for monetary relief, namely an accounting of profits, and injunctive relief separately. Courts have generally agreed that the doctrine of retroactivity precludes monetary relief under the FTDA for any allegedly diluent acts that occurred prior to the statute's enactment in 1996, but "are split on whether the presumption against retroactivity also prohibits injunctive relief in this context." *Black & Decker, Inc. v. Pro–Tech Power Inc.,* 26 F.Supp.2d 834, 857 (E.D.Va.1998) (noting also that "in light of the traditional presumption that courts will not give retroactive effect to intervening statutes, Black & Decker's attempt to collect damages for trademark

dilution must fail as a matter of law"). Therefore, while Kellogg clearly cannot seek an accounting of any profits Exxon may have received for its use of the allegedly diluent Cartoon Tiger mark prior to the FTDA's enactment on January 16, 1996, there is an open question as to whether Kellogg can seek an injunction barring Exxon's future use of the mark.

Whether plaintiffs may seek injunctive relief under the FTDA for violations occurring before 1996 is an issue that has been confronted by numerous courts, though none in this circuit,[5] and its consideration has produced differing conclusions. Some courts have looked at the often expensive conduct taken by defendants to establish their previously legal, but now allegedly diluent, marks and held that injunctive relief under the FTDA has an impermissible retroactive effect. *See Nike, Inc. v. Nike Sec., L.P.,* No. 97 C 008, 1999 WL 98346 (N.D.Ill. Feb.19, 1999); *S Indus., Inc. v. Diamond Multimedia Sys., Inc.,* 991 F.Supp. 1012, 1020–22 (N.D.Ill.1998); *Resorts of Pinehurst, Inc. v. Pinehurst Nat'l Dev. Corp.,* 973 F.Supp. 552 (M.D.N.C.1997); *Circuit City Stores, Inc. v. OfficeMax, Inc.,* 949 F.Supp. 409 (E.D.Va.1996). Other courts, led by the Court of Appeals for the Eighth Circuit in *Viacom Inc. v. Ingram Enterprises, Inc.,* 141 F.3d 886 (8th Cir.1998), have distinguished claims seeking damages for violations of the FTDA that occurred before the statute was passed from injunctive relief, which ostensibly is directed towards future violations of the act. These courts have held that the FTDA allows prospective relief for continuing acts of trademark dilution, even if the allegedly diluent behavior began before the FTDA was enact-

---

**5.** In *Jet, Inc. v. Sewage Aeration Sys.,* 165 F.3d 419 (6th Cir.1999), the Court of Appeals for the Sixth Circuit did not reach this issue, in holding that the plaintiffs in that case could not present enough evidence of dilution irre-

spective of federal law. *Jet,* 165 F.3d at 424 ("We will ... consider the merits of the state dilution claim rather than decide the federal statutory retroactivity question.").

ed in 1996. *See also Hasbro, Inc. v. Clue Computing, Inc.,* 66 F.Supp.2d 117 (D.Mass.1999); *Medic Alert Found. United States, Inc. v. Corel Corp.,* 43 F.Supp.2d 933, 941 (N.D.Ill.1999); *Fuente Cigar, Ltd. v. Opus One,* 985 F.Supp. 1448, 1451–53 (M.D.Fla.1997).

With no clear direction from the Sixth Circuit Court of Appeals and with policy arguments on both sides, this court turns first to the United States Supreme Court opinion in *Landgraf* for guidance. In *Landgraf,* the Court noted: "When the intervening statute authorizes or affects the propriety of prospective relief, application of the new provision is not retroactive." *Landgraf,* 511 U.S. at 273, 114 S.Ct. 1483. Courts holding that prospective relief under the FTDA is impermissibly retroactive have dismissed this language by the court as "dicta," *Circuit City,* 949 F.Supp. at 417, and "not specifically relate[d] to the issue decided in that case." *Nike,* 1999 WL 98346, at \*7. However, as one court noted, "[i]f the language in *Landgraf* stating that prospective relief cannot have retroactive effect is 'dicta,' then it is nonetheless dicta that goes to the essence of what 'retroactive effect' means." *Fuente Cigar,* 985 F.Supp. at 1452; *see also Wright v. Morris,* 111 F.3d 414, 419 (6th Cir.1997) ("Where there is no clear precedent to the contrary, we will not simply ignore the [Supreme] Court's dicta."); *Jordon v. Gilligan,* 500 F.2d 701, 707 (6th Cir.1974) ("Even the [Supreme] Court's dicta is of persuasive precedential value."). Moreover, this supposed "dicta" is consistent with the sentiment expressed by the Court in other cases. For example, in *American Steel Foundries v. Tri–City Central Trades Council,* 257 U.S. 184, 42 S.Ct. 72, 66 L.Ed. 189 (1921), a case cited in *Landgraf,* the Court acknowledged that "relief by injunction operates *in futuro,*" thus seemingly precluding injunctive relief from retroactivity concerns. *Id.* at 201, 42 S.Ct. 72. In an older case, *United States v. Trans–Missouri Freight Ass'n,* 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007 (1897), the Court went even further in explaining why the prospective nature of injunctive relief cannot be considered retroactive:

> It is said that to grant the injunction prayed for in this case is to give the statute a retroactive effect; that the contract, at the time it was entered into, was not prohibited or declared illegal by the statute, as it had not then been passed, and to now enjoin the doing of an act which was legal at the time it was done would be improper. We give to the law no retroactive effect. The agreement in question is a continuing one. . . . Assuming such action to have been legal at the time the agreement was first entered into, the continuation of the agreement, after it has been declared to be illegal, becomes a violation of the act.

*Id.* at 342, 17 S.Ct. 540. Without directly confronting the issue, the Supreme Court has strongly implied that injunctive relief under a statute like the FTDA will usually not have an impermissible retroactive effect.

The Court of Appeals for the Sixth Circuit drew the same conclusion in a different context in *Wright v. Morris,* 111 F.3d 414 (6th Cir.1997). In *Wright,* the court of appeals considered the retroactive effect of the Prison Litigation Reform Act of 1996 ("PLRA"), Title VIII of the Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub.L. No. 104–134, 110 Stat. 1321. Specifically, the court of appeals examined whether the PLRA's § 803(d) requirement that inmates exhaust "such administrative remedies as are available" before filing suits challenging prison conditions under 42 U.S.C. § 1983 applied to complaints filed before the PLRA was enacted. 42 U.S.C. § 1997e(a) (1994). Relying largely on *Landgraf,* the *Wright* court

held that "[b]ecause the language of 42 U.S.C. § 1997e(a) is explicitly prospective and there is no reason to think that Congress intended a retroactive effect, [it would] not apply the new administrative exhaustion requirement to these cases where appeals were pending in this court on April 26, 1996, the day the PLRA was enacted." *Wright*, 111 F.3d at 423. In doing so, the court distinguished the Supreme Court's holding in *Landgraf* from the Court's decision in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), in which the plaintiff sought injunctive relief, and noted: "Under *Landgraf*, applying a new statute to pending cases is proper where plaintiff seeks only future injunctive relief." *Id.* at 419. Therefore, while the Court of Appeals for the Sixth Circuit has not explicitly addressed whether a mark created before the FTDA was passed can be enjoined under that statute, the *Wright* decision illustrates that the court would not consider such injunctive relief to be retroactive.

Requiring Exxon to conform its behavior to the congressional mandate of the FTDA is not "manifestly inequitable," as the court in *Circuit City* suggested. *Circuit City*, 949 F.Supp. at 419. Even if Exxon developed its allegedly diluent Cartoon Tiger mark long before it could have known that it would be liable in federal court for doing so, the company is not protected from suit for behavior now proscribed by Congress. *See Fuente Cigar*, 985 F.Supp. at 1453 ("Expectations, however justified and however dearly purchased, cannot immunize future conduct from legislative fiat.") Kellogg, however, may not take advantage of this shift in the law to usurp any valid property interest Exxon may have in its Cartoon Tiger. *See Viacom*, 141 F.3d at 890 ("If Ingram's non-competing, non-confusing use of its BLOCKBUSTER mark prior to the FTDA's enactment was lawful and resulted in Ingram acquiring a valuable and legitimate property interest of its own, Viacom will presumably not be entitled to an anti-dilution injunction granting it a nationwide monopoly in the use of this rather common word."). Whether Exxon has created any such property interest in its Cartoon Tiger is an issue for trial. For now, though, the court need only conclude that prospective relief is available to Kellogg under the FTDA, and that its dilution claims are not barred by retroactive application of the statute.

The court next turns to the question of whether Kellogg has sufficiently established a *prima facie* case of trademark dilution under the federal statute. As previously noted, the FTDA allows owners of a "distinctive and famous" mark to obtain an injunction against "another person's commercial use in commerce of a mark . . ., if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark." 15 U.S.C. § 1125(c)(1) (2000). Therefore, according to the statutory language,

> For a plaintiff to succeed on a federal claim of dilution "(1) the senior mark must be famous; (2) it must be distinctive; (3) the junior use must be a commercial use in commerce; (4) it must begin after the senior mark has become famous; and (5) it must cause dilution of the distinctive quality of the senior mark."

*Kellogg*, 209 F.3d at 577 (quoting *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 215 (2d Cir.1999)). The parties disagree over the proof needed to establish the fifth element, specifically whether the FTDA requires a showing of actual or merely threatened economic harm, and those courts which have analyzed this issue have also split as to their conclusions. Some courts, including the Courts of Appeals for both the Fourth and Fifth Circuits, have held that the FTDA requires evidence that a defendant's use of a famous mark "has

caused ... actual economic harm to the famous mark's economic value by lessening its former selling power as an advertising agent for its goods or services." *Ringling Bros.*, 170 F.3d at 461; *see also Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 670 (5th Cir.2000) ("[W]e endorse the Fourth Circuit's holding that the FTDA requires proof of actual harm since this standard best accords with the plain meaning of the statute."); *American Cyanamid Co. v. Nutraceutical Corp.*, 54 F.Supp.2d 379, 392 (D.N.J.1999) ("The Court is in agreement with the Fourth Circuit and adopts the standard enunciated by the court in *Ringling*."). In contrast, other courts, including the Courts of Appeal for the Second and Seventh Circuits, have held "that proof of a mere 'likelihood of dilution' is sufficient to satisfy the 'causes dilution' element of [a *prima facie* case of trademark dilution under the FTDA]." *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 468 (7th Cir. 2000); *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 223–25 (2d Cir.1999). Since the Court of Appeals for the Sixth Circuit has not ruled on this issue,[6] this court must conduct its own analysis.

To determine whether the FTDA requires proof that a trademark owner has suffered actual, consummated harm, the court must first look at the plain meaning of the words of the statute:

Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. Our inquiry must cease if the statutory language is unambiguous and "the statutory scheme is coherent and consistent."

*Robinson v. Shell Oil Co.*, 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) (quoting *United States v. Ron Pair Enters.*, 489 U.S. 235, 240, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)). According to the express terms of the FTDA, the owner of a mark that is allegedly being diluted is only entitled to federal relief if a subsequent use of the mark "causes dilution" to the mark. Congress' use of the present tense "causes," instead of the future tense "will cause" or even the subjunctive "could cause," suggests that it intended for the FTDA to address dilution that was actually occurring at the time relief was sought, and not dilution that might occur in the future. *See Westchester Media*, 214 F.3d at 671 ("Both the present tense of the verb and the lack of any modification of 'dilution' support an actual harm standard.").

Moreover, it is doubtful that Congress' choice of wording was accidental. When Congress passed the FTDA in 1996, numerous states, including Tennessee, already had anti-dilution laws,[7] but Congress wanted to provide uniform, federal protection from trademark dilution:

A federal dilution statute is necessary because famous marks ordinarily are used on a nationwide basis and dilution protection is currently only available on a patch-quilt system of protection, in that only approximately 25 states have laws that prohibit trademark dilution. Further, court decisions have been inconsistent and some courts are reluctant to grant nationwide injuctions [sic] for violation of state law where half of the states have no dilution law. Protection for famous marks should not depend on whether the forum where suit is filed has a dilution statute. This simply en-

---

**6.** In its earlier ruling in this case, the Court of Appeals for the Sixth Circuit cited both *Ringling Bros.* and *Nabisco*, but did not address this issue. *Kellogg*, 209 F.3d at 577.

**7.** Tennessee's anti-dilution statute, Tenn.Code Ann. § 47–25–512, was passed in 1982.

courages forum-shopping and increases the amount of litigation.

H.R.Rep. No. 104–374, at 3 (1995), *reprinted in* 1996 U.S.C.C.A.N. 1029, 1030–31. These state anti-dilution statutes were often modeled on language contained in the United States Trademark Association Model State Trademark Bill, 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 24:80 (2000), and contained similar language proscribing conduct "likely to" dilute a valid mark. *See, e.g.,* Tenn.Code Ann. § 47–25–512 (2000), *repealed by* Tennessee Trade Mark Act of 2000, ch. 671, § 3 ("Likelihood of ... dilution of the distinctive quality of a mark shall be a ground for relief...."); Tex.Bus. & Com.Code § 16.29 (1999) ("A person may ... enjoin an act likely to ... dilute the distinctive quality of a mark...."); N.Y.Gen.Bus.Law § 360–l (2000) ("Likelihood of ... dilution of the distinctive quality of a mark shall be a ground for injunctive relief...."); Cal. Bus. & Prof.Code § 14330 (2000) ("Likelihood of ... dilution of the distinctive quality of a mark shall be a ground for injunctive relief...."). Since Congress crafted the FTDA to harmonize the differences among these state laws, it presumably was aware of how they were phrased. Therefore, by choosing not to incorporate similar wording into the FTDA, Congress signaled that it was not adopting the same "likelihood of dilution" standard that the state statutes applied. *See Ringling Bros.,* 170 F.3d at 461 & n. 6 (noting "that in the face of the obvious centrality of 'likelihood of dilution' provisions in the interpretation and application of state anti-dilution statutes for the fifty years of their existence, the federal Act does not so provide" and reviewing commentators who have analyzed this distinction between state and federal trademark law).

■ Courts that have held that the FTDA requires a showing of only a "likelihood of dilution" criticize focusing on the phrase "causes dilution" as using "excessive literalism to defeat the intent of the statute." *Nabisco,* 191 F.3d at 223. They primarily argue that it will be difficult for trademark owners to provide evidence of actual dilution, even by such common means as revenue data and consumer surveys:

> [I]t is possible that the distinctiveness of [a] mark could be diluted even as its sales are increasing, albeit not increasing as much as they would in the absence of the offending mark. Even if diminished revenue could be shown, moreover, it would be immensely difficult to prove that the loss occurred as a result of the dilution of the senior mark. Customer surveys ... are expensive, time consuming, and subject to manipulation. In addition, we doubt that dilution of the distinctiveness of a mark is something that can be measured on an empirical basis by even the most carefully constructed survey. It is hard to believe that Congress would create a right of action but at the same time render proof of the plaintiff's case all but impossible.

*Eli Lilly & Co.,* 233 F.3d at 468 (citations omitted); *Nabisco,* 191 F.3d at 224. However, just because the plain meaning of a statute makes the plaintiff's burden more onerous does not mean that it should be ignored. Requiring plaintiffs to prove actual harm under the FTDA is not absurd. *See Armstrong Paint & Varnish Works v. Nu–Enamel Corp.,* 305 U.S. 315, 333, 59 S.Ct. 191, 83 L.Ed. 195 (1938) ("[T]o construe statutes so as to avoid results glaringly absurd, has long been a judicial function."). As the Fourth Circuit noted in *Ringling Brothers,*

> That economic harm inevitably will result from any replicating junior use is by no means that certain. It is not at all improbable that some junior uses will

have no effect at all upon a senior mark's economic value, whether for lack of exposure, general consumer disinterest in both marks' products, or other reasons. Indeed, common sense suggests that an occasional replicating use might even enhance a senior mark's "magnetism"—by drawing renewed attention to it as a mark of unshakable eminence worthy of emulation by an unthreatening non-competitor. Imitation, that is, may occasionally operate in the marketplace as in social manners as the "sincerest form of flattery." In any event, there are enough reasons why replicating junior use of a mark might not cause any actual economic harm to a senior mark that it is not a proper subject for judicial presumption.

*Ringling Bros.*, 170 F.3d at 460 (citation omitted). By punishing only those commercial entities whose use of a famous mark actually "causes dilution," the FTDA may make it more difficult for trademark owners to obtain federal relief, but it ensures that trademark owners do not receive the windfall of such relief when they have not been harmed.

■ Accordingly, the plain meaning of the statutory language in the FTDA is not so adverse to the congressional intent underlying the statute that it should be cast aside. *See Ron Pair Enters.*, 489 U.S. at 242, 109 S.Ct. 1026 ("The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'") (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982)).

Therefore, since the FTDA only restricts trademark use that "causes dilution," the court holds that a trademark owner is required to show proof that its mark has actually been diluted by the defendant before it can be granted relief under the statute.[8]

■ The court now addresses whether Kellogg has provided enough evidence to raise a question of material fact as to whether Exxon's use of the Cartoon Tiger has actually diluted Kellogg's Tony the Tiger mark. The FTDA defines "dilution" as "the lessening of the capacity of a famous mark to identify and distinguish goods or services." 15 U.S.C. § 1127 (2000). Since Kellogg alleges that its Tony the Tiger mark has been diluted by Exxon's use of the Cartoon Tiger to market and promote convenience food products sold at Exxon's convenience food stores, Kellogg must produce some evidence that would lead a trier of fact to conclude that this specific use of the Cartoon Tiger has lessened the capacity of Tony the Tiger to identify and represent Kellogg's food products. Moreover, in order to maintain its claims under theories of both dilution by blurring and dilution by tarnishment, Kellogg must provide proof that each type of dilution has occurred. Though the two types of dilution are directed at different kinds of harm, the evidence needed to show either would be somewhat similar, because both involve the diminution of a trademark's "selling power" by mental association with another, junior mark. To illustrate, the *Ringling Brothers* court lists several ways that a trademark owner like

---

8. Trademark owners who can only show a "likelihood of dilution" will often be able to seek relief under applicable state law. Tennessee, however, has recently passed the Tennessee Trade Mark Act of 2000 ("TTMA"). The TTMA amends the state anti-dilution law to adopt language similar to the FTDA. *See* Tenn.Code Ann. § 47-25-513(a) (2000) ("The owner of a mark which is famous in this state shall be entitled ... to an injunction against another person's commercial use of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark.")

Kellogg can show "actual dilution," regardless of the type of dilution involved:

Most obviously, but most rarely, there might be proof of an actual loss of revenues, and proof of replicating use as cause by disproving other possible causes. Most obviously relevant, and readily available, is the skillfully constructed consumer survey designed not just to demonstrate "mental association" of the marks in isolation, but further consumer impressions from which actual harm and cause might rationally be inferred. Finally, relevant contextual factors such as the extent of the junior mark's exposure, the similarity of the marks, the firmness of the senior mark's hold, are of obvious relevance as indirect evidence that might complement other proof.

*Ringling Bros.*, 170 F.3d at 465 (citation omitted). In all of these methods, though, the key inquiry remains the same: Kellogg must show that Exxon's use of the Cartoon Tiger to market and promote convenience store products erodes the "selling power" of the Tony the Tiger mark. *Id.* at 464–65.

Kellogg has not provided any proof that it has lost revenue as a result of Exxon's use of the Cartoon Tiger to market and promote convenience store products. In October 1997, in response to interrogatories submitted by Exxon, Kellogg conceded that it had no knowledge of any revenue it had lost due to Exxon's use of the Cartoon Tiger:

*INTERROGATORY NO. 6:*

State the bases for your denial of Exxon's Request for Admission No. 64, including an explanation of each sale you have lost as a result of Exxon's use of its WHIMSICAL TIGER mark, state the dollar amount of such sales, identify the individual(s) most knowledgeable about such lost sales, and identify all documents which evidence such lost sales or otherwise support Kellogg's denial.

*RESPONSE TO INTERROGATORY NO. 6:*

Kellogg has no specific information regarding lost sales at this time.

(Barber Dec. 8, 1997 Decl.Ex. H, at 5.) Since then, Kellogg has not supplemented the record to include information about any such lost revenue. Without such data, the court cannot conclude that Kellogg has suffered any measurable financial harm from Exxon's use of the Cartoon Tiger.

Kellogg could still show that the "selling power" of Tony the Tiger has been diminished by Exxon's challenged use of the Cartoon Tiger using a "skillfully constructed consumer survey." *See* Patrick M. Bible, Comment, *Defining and Quantifying Dilution Under the Federal Trademark Act of 1995: Using Survey Evidence to Show Actual Dilution*, 75 U.Colo.L.Rev. 295, 327–28 (Winter 1999) ("An effective survey ... must establish not only that consumers associate the mark with both parties, but also that some quanta of the original mark's identifying ability or selling power has been diminished."). To that end, Kellogg has submitted the results of a survey performed by Dr. Gerald Ford in 1997. (Expert Rep. of Dr. Gerald Ford, filed July 1, 1997 [hereinafter Ford Rep.].) In the survey, shopping center customers in eight metropolitan areas were shown four separate items: a plastic cup, available with a beverage purchase at an Exxon gas station convenience store, with the Exxon Cartoon Tiger but not the Exxon house mark on the cup ("Cup I"); a plastic insulated cup with a lid, available for purchase at an Exxon gas station convenience store, with the Exxon Cartoon tiger and the Exxon house mark on the cup ("Cup II"); and two print advertisements with the Exxon Cartoon Tiger and the Exxon house mark ("Advertisements"). (Ford

Rep.Ex. D, at 2.) They were then asked two questions:

What company or name or brand, if any, comes to mind when you see this tiger? What other companies or names or brands, if any, come to mind when you see this tiger?

If participants answered "Kellogg's" or "Frosted Flakes" to either question, Ford counted them as associating the product with Kellogg, even if they answered Exxon to the other question as well. On the other hand, Ford only counted a participant as associating the product with Exxon if he or she answered "Exxon" to either question, and didn't refer to Kellogg at all. (Ford's survey did not ask the participants whether they identified the products primarily with Kellogg or Exxon, or whether they could distinguish between Tony the Tiger and the Cartoon Tiger.) Ford's survey yielded the following results:

| Product | Percentage who associated the product with Kellogg | Percentage who associated the product with Exxon |
|---|---|---|
| Cup I | 71.72% | 20.20% |
| Cup II | 70.00% | 22.00% |
| Advertisements | 69.57% | 20.65% |

(Ford Rep.Ex. D. at 26, 41, 56.) As shown above, within a few percentage points that Ford estimates as the margin of error (Ford Dep. at 179), 70% of the customers asked associated the Cartoon Tiger with Kellogg, regardless of the product on which the Cartoon Tiger was shown.

Assuming *arguendo* that Ford's survey indicates that the similarity between Tony the Tiger and the Cartoon Tiger has led a majority of consumers to associate Exxon's products with Kellogg and has thus diminished Kellogg's ability to identify its own products using the Tony the Tiger mark, it would suffice as enough proof of dilution to preclude summary judgment. Exxon, however, contends that "[b]ecause Kellogg's own evidence shows no statistically significant difference between consumer reactions to use of the Cartoon Tiger on non-petroleum products compared to use of the Exxon Cartoon Tiger on petroleum products, its dilution claims should be dis-missed." (ExxonMobil's Supp.Mem.Supp. Mot. for Part Summ.J. Dismissing Kellogg's Dilution Claims at 13.) Put another way, Kellogg challenges Exxon's right to use the Cartoon Tiger to market convenience food products, like Cups I and II, but not its right to use the Cartoon Tiger to promote its motor fueling operation in gasoline advertisements, like those in the survey.[9] According to Ford's analysis, though, approximately the same percentage of customers surveyed associated the Cartoon Tigers on Exxon's products with Kellogg, regardless of the product tested. Exxon interprets these results as implying that the Cartoon Tigers on Cups I and II and the Cartoon Tigers on the Advertisements have the same diluent effect, even though Kellogg challenges the former but not the latter. Exxon concludes that Kellogg should not be entitled to relief, because Ford's survey does not indicate that the use of the Cartoon Tiger that Exxon

9. Kellogg originally challenged Exxon's use of the Cartoon Tiger to advertise and promote motor fuels, but abandoned these claims in its appeal of this court's August 31, 1998 order to the Court of Appeals for the Sixth Circuit. (Appellant Br. at 2 n. 2.)

challenges—marketing convenience food products—will cause any further dilution of Kellogg's Tony the Tiger mark than that which has already occurred due to Exxon's valid use of the Cartoon Tiger to promote its motor fuels.

While Exxon's argument is logically sound, it fails to consider a key variable necessary for determining whether dilution occurs—specifically, the number of customers exposed to the allegedly diluent mark. If Ford's survey indeed indicated that Exxon's challenged use of the Cartoon Tiger causes no further dilution than its unchallenged use of the Cartoon Tiger, then Exxon would be entitled to summary judgment. *Cf. Simon Prop. Group, L.P. v. mySimon, Inc.,* 104 F.Supp.2d 1033, 1046 (S.D.Ind.2000) (rejecting a proposed survey, albeit in the context of trademark infringement, to determine whether consumers confused the parties' federal trademarks using the name "Simon" that "would disregard entirely the fact that other businesses, including other large and relatively well-known ones, use 'Simon' as part of their names on the Internet and could also be confused with SPG."). All Ford's survey demonstrates, though, is that the same *percentage* of people exposed to both uses of the Cartoon Tiger associated it with Kellogg. There is no indication of how many people are exposed to the Cartoon Tiger by each type of usage, so it is impossible to gauge how much dilution each will cause.

Kellogg contends that "Exxon primarily, if not exclusively, uses the Cartoon Tiger to promote foods, beverages and convenience stores—not gasoline." (Kellogg's Second Supp.Mem. Opposing Mot. for Part Summ.J. Dismissing Kellogg's Dilution Claims at 3–4.) As proof, it cites documents from Exxon's Market Sciences Department, which note that Exxon's convenience stores are "symbolized by the cartoon tiger—fun, while the live tiger

symbolizes the power of gasoline." (Kellogg's Second Supp.Mem. Opposing Mot. for Part Summ.J. Dismissing Kellogg's Dilution Claims Ex. 3, EMK2000803.) Whether Kellogg is correct as to the extent of Exxon's use of the Cartoon Tiger is a question of material fact that must be decided by the trier of fact in determining whether the Cartoon Tiger causes dilution. For the purposes of Exxon's summary judgment motions, however, the court must accept Kellogg's allegations as true. Therefore, assuming that more consumers will be exposed to the allegedly diluent Cartoon Tiger mark through Exxon's use of it in marketing its convenience store products than its use in promoting motor fuels, the court finds that Kellogg has provided sufficient proof that the challenged use of the Cartoon Tiger "causes dilution" to preclude summary judgment.

■ ■ The court notes, however, that Ford's survey only suffices as proof that Exxon's use of the Cartoon Tiger to market convenience food products causes dilution "by blurring." As discussed earlier, dilution by blurring only occurs when a company's mark (Exxon's Cartoon Tiger) leads customers to associate its products with another company (Kellogg) with a similar, but senior, mark (Tony the Tiger). On the other hand, dilution "by tarnishment" entails more than merely associating two marks together. This type of dilution only occurs if the junior mark is used in a context that degrades or debases the senior mark associated with it. *See Hormel Foods Corp. v. Jim Henson Prods., Inc.,* 73 F.3d 497, 507 (2d Cir.1996) ("The *sine qua non* of tarnishment is a finding that plaintiff's mark will suffer negative associations through defendant's use.") Even though Ford's survey indicates that using the Cartoon Tiger to market convenience food products leads more customers to associate Exxon's products

with Kellogg, it does not provide any evidence that these customers form negative impressions about Kellogg or Tony the Tiger because of the association. In fact, Kellogg has not presented any direct evidence of dilution by tarnishment, such as reduced sales growth or increased negativity towards Kellogg's Tony the Tiger mark. Without such direct evidence, the court need not consider other "contextual factors" listed by the *Ringling Brothers* court, "such as the extent of the junior mark's exposure, the similarity of the marks, [or] the firmness of the senior mark's hold," as they only provide "indirect evidence that might complement other proof." *Ringling Bros.*, 170 F.3d at 465. Since there is no proof that Exxon's use of the Cartoon Tiger in marketing convenience food products has caused actual, consummated dilution by tarnishment of Kellogg's Tony the Tiger mark, no question of material fact exists as to the merits of Kellogg's claims under the FTDA. Therefore, while the court denies Exxon's motion for summary judgment with regard to Kellogg's claim of dilution by blurring under the FTDA, the court grants Exxon's motion with regard to Kellogg's claims of dilution by tarnishment under that same statute.

 Kellogg has also brought dilution claims under Tennessee law. (Am. Compl. ¶¶ 63–64.) In contrast to the FTDA, Tennessee law, as it was written when this case was filed,[10] allowed claims to be brought where only "a likelihood of dilution" was shown:

Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark registered under this part, or a mark valid at common law, or a trade name valid at common law, shall be a ground for relief, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

Tenn.Code Ann. § 47–25–512 (2000), *repealed by* Tennessee Trade Mark Act of 2000, 2000 Tenn.Pub.Acts, Ch. 671, § 3. Determining whether there is a "likelihood of dilution" differs from finding actual dilution; as discussed earlier, the latter requires proof of actual harm, while the former requires showing only that such harm is probable. Proof that one mark has already diluted another, more senior one nevertheless suggests that further dilution will probably occur. Consequently, having concluded that Kellogg has shown proof of actual dilution by blurring by Exxon's use of the Cartoon Tiger to market convenience food products, the court similarly finds that there is a "likelihood of dilution" by blurring sufficient enough for the court to deny summary judgment of this claim.

 Kellogg's claims of dilution by tarnishment under Tennessee law require further analysis, however. Unlike its claims of dilution by tarnishment under the FTDA, which the court found wanting because there was no proof of actual, consummated dilution, Kellogg's claims of dilution by tarnishment under Tennessee law require only that there be a likelihood of such dilution. This "likelihood" can be

---

**10.** In 2000, the Tennessee General Assembly enacted the Tennessee Trade Mark Act of 2000, which changed the wording of Tennessee's antidilution law. Tenn.Code Ann. § 47–25–513 (2000). The new language is identical to that of the FTDA, and accordingly, "the construction given the federal act should be examined as persuasive authority for interpreting and construing [Tennessee antidilu-

tion law]." Tennessee Trade Mark Act of 2000, 2000 Tenn.Pub.Acts, Ch. 671, § 1. In passing this new law though, the General Assembly expressly provided that it "shall not affect any suit, proceeding or appeal then pending." *Id.* Therefore, the new law is inapplicable to the present litigation, which was initiated in 1996.

shown, if "the plaintiff's trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context likely to evoke unflattering thoughts about the owner's product." *Deere & Co. v. MTD Prods., Inc.,* 41 F.3d 39, 43 (2d Cir.1994). Although Ford's survey provides evidence that Kellogg's Tony the Tiger has been "linked" to Exxon's Cartoon Tiger, Kellogg still needs to show either that the products with which Exxon uses the Cartoon Tiger are "of shoddy quality," or that Exxon uses the Cartoon Tiger in a context that is "unflattering" to Tony the Tiger. Kellogg, in fact, bases its claims of dilution by tarnishment on the second approach, arguing two separate theories by which Exxon allegedly used the Cartoon Tiger in a manner dissonant with the image of Tony the Tiger: (1) Exxon's general corporate image as a large oil company tarnishes the image of Tony the Tiger; and (2) Exxon's use of the Cartoon Tiger to advertise and promote the sale of alcohol and tobacco products tarnishes the image of Tony the Tiger.[11] (Am.Compl.¶ 25.)

As an initial point, Kellogg's grounds for its claims of dilution by tarnishment are somewhat unusual. Although courts have stated that tarnishment can occur whenever "the goodwill and reputation of a plaintiff's trademark is [sic] linked to products which are of shoddy quality or which conjure associations that clash with the associations generated by the owner's lawful use of the mark," *L.L. Bean, Inc. v. Drake Publishers, Inc.,* 811 F.2d 26, 31 (1st Cir.

1987), they usually find tarnishment only in cases where a distinctive mark is depicted in an obviously degrading context, often involving a sexual activity, obscenity, or illegal activity. *Elvis Presley Enters., Inc. v. Capece,* 950 F.Supp. 783, 799 (S.D.Tex. 1996); *Clinique Labs., Inc. v. Dep Corp.,* 945 F.Supp. 547, 562 (S.D.N.Y.1996); *see, e.g., Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 205 (2d Cir.1979) (Dallas Cowboy Cheerleader uniforms used in sexually depraved movie); *Toys "R" Us, Inc. v. Akkaoui,* 40 U.S.P.Q.2d 1836, 1838, 1996 WL 772709 (N.D.Cal.1996) ("Adults R Us" Internet shopping service sold sexual devices and clothing); *Anheuser–Busch, Inc. v. Andy's Sportswear, Inc.,* 40 U.S.P.Q.2d 1542, 1543 (N.D.Cal.1996) ("Buttwiser" T-shirts); *Hasbro Inc. v. Internet Entm't Group Ltd.,* 40 U.S.P.Q.2d 1479, 1480, 1996 WL 84853 (W.D.Wash.1996) (CANDYLAND mark used to identify a sexually explicit Internet site); *Pillsbury Co. v. Milky Way Prods., Inc.,* 215 U.S.P.Q. 124, 135 (N.D.Ga.1981) (Pillsbury dough boy depicted engaging in sexual intercourse); *Coca–Cola Co. v. Gemini Rising, Inc.,* 346 F.Supp. 1183, 1189 (E.D.N.Y.1972) (Coca–Cola logo used in poster stated "Enjoy Cocaine"). Less steamy conduct is often found insufficient as grounds for claims of tarnishment. *See, e.g., New York Stock Exchange, Inc. v. New York, New York Hotel, LLC,* 69 F.Supp.2d 479, 492 (S.D.N.Y.1999) ("The NYSE has not shown that it has publicly opposed legal gambling or that legal gambling is so unwholesome

**11.** Kellogg originally claimed that the Tony the Tiger mark was tarnished by the Cartoon Tiger because of (1) Exxon's general corporate image and (2) Exxon's use of the Cartoon Tiger to sell 'non-nutritional' foods such as soda and candy at its convenience stores. (Compl.¶ 25.) Since then, Kellogg has withdrawn its tarnishment claim based on Exxon's use of the Cartoon Tiger to promote non-nutritious foods (Kellogg's Supp.Mem. in Opp'n to Mot. for Part. Summ.J. Dismissing Dilution by Tarnishment Claim at 2), but has amended its complaint to assert a claim of tarnishment based on Exxon's use of the Cartoon Tiger to promote tobacco and alcohol products at its convenience stores (Am. Compl. ¶ 25; *see also* Mar. 23, 2001 Order Overruling Exxon Mobil's Objection to Kellogg's Untimely Claims Relating to Alcohol and Tobacco).

or scandalous that any association with it can sustain a claim for tarnishment."); *see also* McCarthy § 24:104 ("So long as the defendant's use does not place plaintiff's trademark in a degrading or jarring context, tarnishment will probably not be found."). It is debatable whether Exxon's use of the Cartoon Tiger in marketing convenience food products can really constitute tarnishment, since it involves legitimate and accepted goods and practices.

Kellogg's allegation that Exxon's corporate image tarnishes its Tony the Tiger mark is particularly suspect in light of Kellogg's decision to forego challenging Exxon's use of the Cartoon Tiger to market and promote motor fuels. Kellogg alleges that the facts of this case suggest the following conclusions:

1. The *Exxon Valdez* incident was a public relations disaster for Exxon and caused consumers to have a very negative image of the company.

2. In an attempt to repair that image, Exxon in 1990–91 developed new advertising campaigns that were intended to promote a warmer, friendlier image of the company. The campaigns included a reintroduction of the Cartoon Tiger, redrawn to appear more friendly and humanitarian.

3. Consumers perceived the redrawn tiger to be modeled on TONY THE TIGER® and to reflect a departure from the more vital, macho depiction of the Cartoon Tiger used in past decades.

(Mem. of Kellogg in Opp. to Exxon's Summ.J.Mot. with respect to Claims of Dilution by Tarnishment at 9–10.) Correspondingly, Kellogg complains that "[t]he use of the Exxon Cartoon Tiger by Exxon tarnishes the image of TONY & TIGER DESIGN®, and thus that of Kellogg, because many people associate large oil companies like Exxon with oil pollution and other forms of environmental damage." (Compl.¶ 25.) All of these arguments were made, however, before Kellogg withdrew its claims against Exxon's use of the Cartoon Tiger to market and promote petroleum products. It is incongruous for Kellogg now to complain that Exxon's use of the Cartoon Tiger in marketing convenience food products somehow links Tony the Tiger to unsavory public opinion about the oil industry and its allegedly poor environmental record, while allowing Exxon to use the Cartoon Tiger to market those products, like petroleum, that are the subject of public, environmental concern. *Cf. Ringling Bros.–Barnum & Bailey Combined Shows, Inc. v. B.E. Windows Corp.,* 937 F.Supp. 204, 211 (S.D.N.Y.1996) (dismissing a claim of tarnishment brought by Ringling Bros. against the owner of "The Greatest Bar on Earth" for linking the circus' name to "an adult establishment where alcohol is served," because "alcohol is served at some of the venues where the circus performs, and some of Ringling's restaurant sponsors also sell alcohol.").

Moreover, even if Exxon's corporate image has been tainted by its past environmental troubles, there is no evidence before this court suggesting that the Cartoon Tiger has been associated with that taint. Noticeably absent in the record is any mention that Exxon ever used the image of the Cartoon Tiger to promote or advocate environmental degradation. In fact, while Exxon admittedly expanded its use of the Cartoon Tiger after the *Exxon Valdez* oil spill in order to resuscitate its public image, there is no proof that Exxon used the Cartoon Tiger in any way that linked it to its former environmental mishaps. *Cf. Anheuser–Busch, Inc. v. Balducci Publ'ns,* 28 F.3d 769 (8th Cir.1994) (finding dilution where a mock magazine advertisement portrayed a partially-obscured can of Michelob Dry pouring oil onto a fish and an oil-soaked rendition of the A & Eagle design (with the eagle exclaiming "Yuck!") below a Shell oil symbol underneath the

headings, "ONE TASTE AND YOU'LL DRINK OILY" and "MICHELOB OILY®"). After all, to do so would be illogical, as it would sully Exxon's new "humanitarian" tiger with the mistakes of its past. This court thus finds itself in agreement with the Court of Appeals for the Fifth Circuit in *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070 (5th Cir. 1997), which rejected a similar claim of dilution based upon Exxon's poor corporate image:

> Oxxford seeks, through ... a flimsy, attenuated assertion that there is an ease of association between the marks "Oxxford" and "Exxon," to hold Exxon responsible for all activities and events within the last twenty-five years falling under its corporate aegis and resulting in general negative publicity for the corporation. Such an approach ignores the distinction between the use of the appellation "Exxon" as a device of corporate identity and its use as a trade name or trademark, *i.e.*, as an indicator of origin and/or quality of particular goods and services. The "acts" which comprise the basis of Oxxford's claim, such as the Exxon Valdez spill and resulting jury verdict, bear no relationship to the quality or reputation of the products sold or services provided under cover of Exxon's marks (or to the quality or reputation of products sold or services provided under Oxxford's marks).

*Oxxford Clothes,* 109 F.3d at 1083. Consequently, the court grants Exxon's motion for summary judgment with regard to Kellogg's claims that Exxon's corporate image dilutes by tarnishment Kellogg's Tony the Tiger mark.

Kellogg's only remaining claim of dilution involves its assertion under Tennessee law that Exxon's use of the Cartoon Tiger to advertise and promote alcohol and tobacco products tarnishes Kellogg's Tony the Tiger mark. Since this claim specifi-cally pertains to the use of the Cartoon Tiger that Kellogg now exclusively challenges, *i.e.*, marketing and promoting convenience food products, many of the grounds that the court has adopted in granting Exxon summary judgment on Kellogg's other claims of dilution are inapplicable. Because Exxon has not moved for summary judgment with regard to this claim and correspondingly has not posed arguments specifically applicable to it, moreover, the court finds no reason that it should be dismissed.

In summary, the court (1) denies Exxon summary judgment with regard to Kellogg's claim of dilution by blurring under the FTDA; (2) grants Exxon summary judgment with regard to Kellogg's claims of dilution by tarnishment under the FTDA; (3) denies Exxon summary judgment with regard to all of Kellogg's state law claims of dilution by blurring; and (4) grants Exxon summary judgment with regard to Kellogg's state law claim of dilution by tarnishment premised on Exxon's allegedly poor corporate image as an oil company. Kellogg may also proceed with its state law claim of dilution by tarnishment premised on Exxon's use of the Cartoon Tiger to market and promote alcohol and tobacco products.

IT IS SO ORDERED.